## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FREDERICK FOWLER,

        Plaintiff,

v.                                CIVIL CASE NO. 05-60067
                                        HON. MARIANNE O. BATTANI

CONSUMERS ENERGY COMPANY,

        Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment (Doc. #25). Plaintiff sued Defendant for violating Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. 2000e, *et. seq*. He alleges that Consumers Energy discriminated against him and harassed him based on his race. His sole claim contains discriminatory treatment, hostile work environment, constructive discharge, and retaliation components.

### II.    STATEMENT OF FACTS

Consumers hired Fowler in 1983. He was a temporary meter reader and janitor before becoming a full-time employee in 1985. In August of 1990, he joined the gas department. In 1992-1993, he was a Trenching Machine Operator. He became a gas lines worker on March 1, 1994. Fowler remained in this position until his disability retirement for mental illness/disorder effective September 1, 2003.

Marvin Sanders was one of Fowler's supervisors for the period spanning the summer of 1996 to April of 2001.  During the time frame when Sanders was the Fowler's immediate supervisor, Fowler was the only African American gas lines employee.  Fowler complained to Sanders of various perceived acts of discrimination by others.  Fowler felt that he was being singled out and felt that there were different rules regarding him.  Sanders testified that racial conflicts in the work place existed because there was such a limited number of African Americans and that racial tensions in the Jackson workplace were often running high.  Sanders testified that rule changes made by management as a result of Fowler's actions also caused racial tensions and animosity toward Fowler.

Elaborating, Sanders described an incident in which a group of white employees were plotting to force the Fowler to take on-call duty.  According to Sanders, the white employees stated, "We're going to force that nigger to take it."  He testified that things of this nature came out periodically and he was pretty sure he heard other such racially based comments.  Sanders reported the reference to Fowler as "that nigger" to his two supervisors.

Fowler also told Sanders about numerous things that were done to him that he believed were harassing and were sabotage in order undermine him in the workplace.  In the first instance, Fowler told Sanders that when he first came on as a gas linesman, someone placed a three-foot black doll or dummy on a ramp outside of the crew area.

In another instance of harassment, someone placed urine in a piece of equipment known as a leak detector belonging to Fowler.  Sanders was present when the urine was discovered in Fowler's equipment, and he testified that the Fowler was very upset and told him, "See this is was I am talking about.  They are sabotaging my jobs and doing things to me." Dep. of Sanders,

2

at 21.  Sanders testified that he witnessed another incident of alleged sabotage in early 2001 when a bolt was discovered in a repair sleeve Fowler attached.  According to Fowler, this was done to cause a leak.  Id., at 20-22.  Other acts of sabotage that Fowler complained of included the dead snake in the glove box of his truck incident and the removal of his testing equipment from his truck.

Citing another instance of disparate treatment, Fowler alleges that he was not allowed to work until he renewed his driver's license, and was essentially suspended without pay until the license was renewed.  However, the records submitted by Defendant show that Fowler was paid during the period of time he claims he was suspended without pay for not having his license.  Moreover, Defendant advanced Fowler money in order renew his license.

Fowler also claims that when calling in sick, he had to speak with the field leader, whereas others had only to call in to the scheduler.  Defendant disputes this, claiming that the policy required everyone had to call in to their field leader, and that Fowler refused to do so.

In large part, because of tensions between management and employees in the workplace, as well as, the perceived discrimination and harassment or sabotage against Fowler, Sanders went to human resources in the spring of 2000 and spoke to the human resources representative.  Sanders advocated for an outside vendor or consultant to look at some of the things going on in the workplace, including racial tension and racial conflict in the work environment.  Help Net ("HN"), an outside consultant, was hired, and two HN advisors were in the Jackson location for four months.

After Sanders transferred in April 2001, Fowler alleges that the racially based harassment and sabotage increased under his next two white supervisors James Kuenner and Kris Anding-

3

Falsetta.  On July 10, 2001, Kuenner asked Fowler why he was not at work the day before as scheduled.  Fowler claims that he told Kuenner on Friday that he might be in, but decided to take a vacation day.  Kuenner then said that the policy for last minute vacations would have to change because of the affect on scheduling.  Fowler became angry, and according to Kuenner, threw his work book across the room, scattering papers, and stating "this is bullshit."  Fowler then asked Kuenner why his female Trenching Machine Operator had been reassigned.  Kuenner explained it was a management decision.  Fowler then allegedly threw his water bottle.  Kuenner issued a letter of discipline the next day, but he was unable to personally deliver it because Fowler took a medical leave due to stress.  According to Fowler, the July 10th incident is an example of the "Fred Rules," which are policy or rules changes made in response to his exercise of longstanding company policies.

When Fowler returned to work after a five month stress leave, he was disciplined for allegedly throwing the water bottle and file folder.  According to Fowler, he did not throw a water bottle, but merely threw the file folder on his desk in disgust.

Upon returning to work in mid-December 2001, his new supervisor, Falsetta said to him, "So you're Fred Fowler" and then sent him to take a drug test.  Fowler asserts that this was another example of being disciplined by withholding his pay for an additional nine days.  However, per company policy, employees off of work for more than thirty days must pass a physical examination, of which a drug test may be a part.  Moreover, the company's pay records establish that Fowler was paid during the nine days awaiting the test results.  When Fowler was finally released from his sick leave, he returned to work in mid-December.  At that time, he was

given Kuenner's discipline letter.  In a Union hearing, the parties agreed that it could be removed from his file in July 2002, one year less than usual, if there were no further incidences.

Fowler asserts that he was disciplined eight additional times in 2002 in less than a seven month period.  He alleges that most of the disciplines are based upon confrontational and harassing behavior toward him, and that most of them were based upon fabrications and false allegations.

In the first instance of alleged discrimination, Fowler alleges his supervisor changed the overtime reporting rules.  Fowler claims that the supervisor told a white employee about the change, but not him.  After finding out about the discrepancy, Fowler confronted the supervisor, and called his supervisor an "asshole."  Fowler received a one-day suspension for the language directed at a supervisor.  As a result of the reporting change, Fowler's receipt of his overtime pay was delayed.

The second identified incident occurred on January 22nd.  Fowler was late for work, and then failed to timely report to his assigned jobsite.  Falsetta issued him a letter of concern on the next day.  Also on the 23rd, he refused Falsetta's direct work order, regarding an improperly fused main.  Falsetta ordered him to redo it because he failed to install "a plate and shoes" when fusing a "T" to a main.  As a result of refusing to re-do the work, Falsetta revoked his fusion card on the advice of William DeBeck, a company trainer, until he could be reassessed.  Fowler admits that the "plate and shoes" were required, but claims he should not have to re-do the work because Falsetta was there helping.  Fowler admits his insubordination.  Marty Kolka, Fowler's field supervisor, issued a 3-week disciplinary lay-off.

5

Upon his return on February 15, 2002, Falsetta, in the presence of other supervisors, asked Fowler to perform some fusion work.  According to Fowler, this is yet another instance of his supervisors belittling, demeaning, and abusing him.

Also in February 2002, Fowler sent a letter to then Vice-President, Carl English, complaining of racial discrimination and harassment.  English immediately ordered a full investigation, through Kolka.  This was assigned to Heather Fambrough, an EEOC Representative.  Fambrough met personally with Fowler.  She then performed an investigation where she personally interviewed employees identified by Fowler as having personal knowledge regarding his complaints.  Ultimately, Fambrough determined that there was no race discrimination, harassment, or other illegal conduct because she could not corroborate any alleged acts of illegal race discrimination or harassment.  She reported her findings to management, and when she met with Fowler to discuss the details of her findings and get his feedback, he simply walked out of the meeting.  Kolka counseled him on April 9, 2002, about his behavior toward Fambrough and company managers.

On May 8, 2002, Fowler received a two-day suspension for using abusive language on April 4, 2002, which was directed at Falsetta.  Falsetta admitted to also swearing at Fowler, but did not receive any discipline.  Kolka ordinarily issued a long-term layoff for this kind of language usage, but the Union negotiated a two-day layoff.  The layoff was from May 8 through the 10th.  Fowler arrived at work on Monday and Tuesday, the 13th and 14th, but went home sick each day.  He continued his absence without calling Falsetta as required for the next three

days.[1]  Fowler called Falsetta after receiving a warning letter.  He did not return to work until

July 6, 2002.  While he was off, Kolka learned that Fowler could not account for his time on

May 8, 2002, did not tell his supervisor he did not complete his assigned work, and did not fill

out his time sheet correctly.  This resulted in another investigation and another letter of

discipline on May 21, 2002.  Fowler was warned that further misconduct could result in his

termination.

Finally, in September 2002, Fowler claims that he could no longer continue to function in

the hostile, discipline-filled work environment.  He began his sick leave on September 1, 2002.

On October 28, 2002, Fowler filed a charge of discrimination with the EEOC.  On September 1,

2003, based on medical reports, and his years of service he was deemed to meet the criteria for,

and placed on, disability retirement.  He claims that the medical leave and the disability

retirement were caused by these acts of discrimination, harassment, and unfair treatment and by

the racially hostile work environment.

## III.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be

granted when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment,
after adequate time for discovery and upon motion, against a party who fails to make a

---

[1] Fowler's EEOC charge states he was subject to discriminatory treatment on 5/15/02.
However, he was not at work that day.

7

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to  support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the Fowler is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242,  256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

8

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at 252.

## IV.    DISCUSSION

### A.    Plaintiff's Discriminatory Treatment and Hostile Work Environment Claims

Fowler alleges that for the vast majority of the time that he worked for Defendant in Jackson, he was the only black non- supervisory employee in the gas distribution workplace. During this time, he alleges he was subjected to numerous acts of racially discriminatory harassment, disparate treatment, and sabotage to undermine his work performance.  He asserts that the harassment and discrimination effectively forced him out of his job.  Nevertheless, before addressing the merits of his discrimination claims,[2] the threshold inquiry the Court must determine is whether those claims are properly before the Court.

"Section 2000e-5(e)(1) requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days 'after the alleged

---

[2] Plaintiff's constructive discharge and retaliation claims are discussed separately below.

9

unlawful employment practice occurred.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 104-105 (2002).  Unlawful employment practices include an employer's failure or refusal to hire, discriminatory discharge, or any practice that otherwise has the effect of discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . . "  42 U.S.C. § 2000e-2(a).  In other words, discrete acts of discrimination are those that have immediate economic or tangible consequences.  See Morgan, 536 U.S. at  115-16.

In Morgan, the Supreme Court held that 42 U.S.C. § 2000e-5(e)(1) acts as a statute of limitations for discrimination claims in instances where discrete acts of discrimination "such as termination, failure to promote, denial of transfer, or refusal to hire . . . ."  Morgan  536 U.S. at 114.  If an employee does not file a charge with the EEOC within 300 days of such an occurrence, then any action premised on a discrete discriminatory act is time barred.

Fowler filed a charge of discrimination with the EEOC on October 28, 2002.  Therefore, any discrete act of discrimination that occurred outside the 300 day period before he filed a charge with the EEOC is time barred.

In attempt to avoid this result, Fowler maintains that the doctrine of equitable tolling should apply to allow in other instances of alleged discrimination that occurred outside the limitation period.  Fowler asserts that he went to the Michigan Department of Civil Rights ("MDCR") on January 27, 2002, and tried to file a charge of discrimination, but that it took a full nine months before that state agency would accept his charge of discrimination.  He argues that he used due diligence in trying to get his complaint filed, but that the MDCR refused to accept it. Fowler contends that he should not be penalized by a strict adherence to the 300 day rule from

10

the date of the complaint when the MDCR delayed, impeded, and ultimately refused his efforts to file a complaint.

Fowler's arguments are not persuasive.  Although he argues he was diligent in attempting to file a discrimination charge, the evidence he produces proves the opposite.  The MDCR sent Fowler a letter on April 22, 2002, requesting that he provide a detailed narrative of his complaint.  On August 22, 20002, the MDCR sent another letter notifying Fowler that a formal civil rights complaint would not be filed because the two-sentence allegation of racial discrimination did not provide sufficient grounds to investigate a formal complaint.  Moreover, according to the August letter, the MDCR investigated his claim, including interviewing him, and concluded that he was disciplined according to company policy based on actions he admitted taking.  There is no evidence that the MDCR refused to accept his complaint, or that the MDCR delayed, impeded, or refused his efforts to file a complaint, and thus, there is no basis to apply the doctrine of equitable tolling.  Therefore, Fowler's claims are limited to any discrete acts of discrimination that occurred from January 1, 2002 through the time of his disability retirement on September 16, 2002.  During that time, Fowler alleges that Defendant subjected him to several discrete acts of discrimination.

In the first, he alleges his supervisor changed the overtime reporting rules.  Fowler claims that the supervisor told a white employee about the change, but not him.  After finding out about the discrepancy, Fowler confronted the supervisor, and called his supervisor an "asshole."  Fowler received a one-day suspension for the language directed at a supervisor.

The second identified incident occurred on January 22nd.  Fowler was late for work, and then failed to timely report to his assigned job site.  Falsetta issued him a letter of concern on the

next day.  Also on the 23rd, he refused Falsetta's direct work order, regarding an improperly fused main.  Falsetta ordered him to redo it.  He refused three times.  Falsetta revoked his fusion card on the advice of William DeBeck, a company trainer, until he could be reassessed.  Plaintiff admits his insubordination.  Fowler's field manager, Marty Kolka, issued a 3-week disciplinary lay-off.

On May 8, 2002, Plaintiff received a two-day suspension for using abusive language toward a supervisor.  The supervisor admitted to also swearing at Fowler, but did not receive any discipline.  The layoff was from May 8 through Friday the 10th.  Plaintiff arrived at work on Monday and Tuesday, the 13th and 14th, but went home sick each day.  He continued his absence without calling Falsetta as required for the next three days.  Plaintiff called Falsetta after receiving a warning letter.  He did not return to work until July 6, 2002.  While he was off, Kolka learned that Plaintiff could not account for his time on May 8, 2002, did not tell his supervisor that he did not complete his assigned work, and did not fill out his time sheet correctly.  This resulted in another investigation and another letter of discipline on May 21, 2002.  Plaintiff was warned that further misconduct could result in his termination.

Finally, in September of 2002, Fowler claims that he was forced to discontinue work because of the stress induced by the hostile, discipline-filled work environment.  He asserts that he was so stressed out that he had to go on medical leave, which eventually became a disability retirement.  He claims that the medical leave and the disability retirement were caused by these acts of discrimination, harassment, and unfair treatment and by the racially hostile work environment.

12

The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995).  When a plaintiff has no direct evidence of discrimination, he must show that: "(1) he is a member of a protected group; (2) he was subjected to an adverse employment decision; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably."  Peltier v. U.S., 388 F.3d 984, 987 (6th Cir. 2004).

Once a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If that burden of production is met, a plaintiff must then prove "by a preponderance of the evidence" that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  To meet his burden, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions.  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994).  "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit" a finding of unlawful discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

Defendant does not dispute that Fowler is a member of a protected group.  However it does dispute that he was subjected to an adverse employment decision, that he was qualified for the position, and that similarly situated non-protected employees were treated more favorably. Addressing the second prong of the test, Defendant argues that Fowler was not subject to an

13

adverse employment decision because he was placed on disability retirement after his sick leave ran out. However, this ignores the other instances where Fowler was suspended without pay, which he contends occurred because of racial animus. Therefore, Fowler has established the first prong of the prima facie case.

Next, Defendant argues that Fowler is not qualified for his job based on his record of tardiness, insubordination, the amount of time that he misses due to "stress," and because of his mental illness. Although there is no evidence that he is capable or willing to return to work, the language of the test is whether the plaintiff *was* qualified for the position. Merely because an employee has discipline problems does not make that employee unqualified for the job. All of Fowler's performance reviews state that Fowler did good work when he was actually at work, and when he actually did do the work. However, there is no evidence that Fowler's mental illness rendered him unable or unqualified to perform the required work at the time of the alleged discriminatory acts. Therefore, Fowler has established that second prong of his *prima facie* case.

Next, Defendant asserts that Fowler has not, and cannot, identify a similarly situated employee outside the protected class who was treated more favorably. Defendant claims that there is no other employee with Fowler's attendance, lack of productivity and penchant for insubordination. However, this is not the group that Fowler must be compared with. "[T]he plaintiff demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)(emphasis in original). There are a number of other gas linesmen that perform the same job duties as Fowler, therefore, as the only African American linesman, there are an ample

14

number of similarly situated linesman outside the protected class with which to compare Fowler. Thus, Fowler has established a *prima facie* case of discrimination.

However, Defendant has proffered a legitimate, non-discriminatory reason for Fowler's discharge, which he must show were not were not Defendant's true reasons, but were merely a pretext for illegal discrimination. To so demonstrate, Fowler "must prove 'that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge.'" Hoskins v. Oakland County Sheriff's Dep't., 227 F.3d 719, 731 (6th Cir. 2000) (quoting Warfield v. Lebanon Correctional Inst., 181 F.3d 723, 728-29 (6th Cir. 1999)).

First, Fowler cannot show "that other employees, particularly employees not in the protected class," were not disciplined or placed on disability retirement "even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Warfield, 181 F.3d at 728-29. Fowler claims that he was subject to scrutiny because of his race. However, he either admits or does not contest the underlying reasons behind the decisions to discipline him.[3] In addition, Fowler's union either filed grievances and got the discipline reduced - but not eliminated - or did not contest the discipline at all. Moreover, he has failed to identify another employee with a track record anywhere close to his regarding run-ins with supervisors. Nor does he have any evidence, other than his subjective beliefs, that the reasons stated did not in fact motivate the discipline and placement on disability retirement. Finally, there is no basis to assert that the proffered reasons were jointly

---

[3] The Court's inquiry only extends to those instances of adverse employment decisions that occurred on or before January 1, 2002.

15

insufficient to motivate the discipline or decision to place him on disability retirement.

Therefore, the discriminatory treatment component of Plaintiff's Title VII claim is DISMISSED.

However, "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . .  The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  Id., at115.

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Id., at 117.  Thus, the question becomes whether Fowler file his EEOC charge within 300 days of an act that violated Title VII's proscription against "requiring people to work in a discriminatorily hostile or abusive environment."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).[4]  In such cases, Title VII is violated "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Id. (citations omitted).  Thus, the harassment must affect a term, condition, or privilege of employment in order for it to fall within Title VII's purview, and it must be sufficiently severe or pervasive to alter the

---

[4] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."  Morgan, 536 U.S. at 116 n.10.

conditions of the victim's employment and create an abusive working environment to be actionable.  See Black v. Zaring Homes, Inc., 104 F.3d 822, 825 (6th Cir. 1997).  Further, "the conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Id., at 825-26.

Fowler identifies a number of acts of alleged harassment in 2002 that occurred over a seven-month period.  A number of the instances of alleged discrimination resulted in a suspension from work without pay because of insubordination, etc.  As in Morgan, such acts are discrete acts of discrimination because they had immediate economic or tangible consequences, and thus, each forms a separate basis for a discrimination suit.  However, he does identify two instances that occurred within the 300-day period, which arguably are not discrete acts of discrimination, but rather, could be classified as acts contributing to a hostile work environment.

The first occurred on February 15, 2002, when Falsetta, in the presence of other supervisors, asked Fowler to perform fusion work.  Fowler claims this is an instance of his supervisors belittling, demeaning, and abusing him.  In the other instance, Fowler received a letter of discipline that served as notice that he was late for the third time that year, and further instances of tardiness could lead to termination.  Fowler claims that a white employee was late many times during 2002, but did not receive a similar disciplinary letter.  Thus, the Court must determine if these occurrences constitute acts of "'discriminatory intimidation, ridicule, and insult,' that are 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[]' . . . ." Id., at 116 (citation omitted).

In making such a determination, "the conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Id., at 825-26.

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Jordan v. City of Cleveland, 464 F.3d 584, 597 (6th Cir. 2006). Fowler does not contest the fact that he was late, or that he had previously incorrectly performed fusion work, which was Falsetta's basis for requesting him to demonstrate his ability to do so correctly. A reasonable person would not find those instances, even taken together, of alleged discrimination severe or pervasive enough that they would unreasonably interfere with an employee's performance or altered the conditions of employment. See McCombs v. Meijer, Inc., 395 F.3d 346, 357 (6th Cir. 2005). Moreover, there is no component of racial intimidation, ridicule, or insult in these acts, and Plaintiff has not established a causal nexus between his race and the complained-of conduct. See Jordan v. City of Cleveland, 464 F.3d 584, 596 (6th Cir. 2006). Therefore, the hostile work environment component of Plaintiff's Title VII claim is DISMISSED.

### B.    The Constructive Discharge Component of Plaintiff's Title VII Claim

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit . . . . To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

18

Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001)(internal quotation marks and

citations omitted). The Sixth Circuit has formally adopted the Fifth Circuit's approach to

determining whether the first prong of the constructive discharge inquiry has been met:.

> Whether a reasonable person would have [felt] compelled to resign depends on
> the facts of each case, but we consider the following factors relevant, singly or in
> combination: (1) demotion; (2) reduction in salary; (3) reduction in job
> responsibilities; (4) reassignment to menial or degrading work; (5) reassignment
> to work under a [male] supervisor; (6) badgering, harassment, or humiliation by
> the employer calculated to encourage the employee's resignation; or (7) offers of
> early retirement or continued employment on terms less favorable than the
> employee's former status.

Id., at 569 (quoting Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000). See also Saroli v.

Automation & Modular Components, Inc., 405 F.3d 446, 451-52 (6th Cir. 2005).

Defendant contends that the Court lacks jurisdiction over this claim because it is outside

the scope of his EEOC complaint. In his EEOC complaint, Fowler alleges that, as part of a

campaign of harassment, his supervisor, a white woman, suspended and otherwise disciplined

him for jobs he performed at her direction, and in her supervision. He claimed that her constant

oversight and undue scrutiny were designed to harass him in an attempt to cause him to make

mistakes so that he would be disciplined or fired. He alleged that his supervisor harassed him

and created a hostile work environment.

The Sixth Circuit has reiterated that the prevailing rule for EEOC charges is that a

subsequent judicial complaint "is limited to the scope of the EEOC investigation 'reasonably

expected' as a result of the discrimination charge filed." Cedar v. Premier Indus. Corp., 1989

WL 20615, *3 (6th Cir. 1989)(citing Farmer v. ARA Servs., Inc., 660 F.2d 1096, 1105 (6th

Cir.1981)). The Cedar court further stated:

> The purpose of the EEOC filing requirement is to initiate the EEOC's investigatory and conciliatory procedures.  Only upon the failure of conciliative efforts will a case end up in court at all.  Any civil suit grows out of a failure to conciliate and is more closely related to the scope of the investigation than the words of the charge.  Thus, courts properly limit the permissible scope of judicial proceedings to the scope of the EEOC investigation. . . . .  Accordingly, this court will closely scrutinize the nature of any civil suit before allowing it to proceed to ensure that it asserts a cause of action within the scope of and closely related to the EEOC charges and investigation.

Id., at *3, (quoted by Zanders v. O'Gara-Hess & Eisenhardt Armoring Co., 952 F.2d 404, 1992 WL 2906, **3 (6th Cir. 1992).  As a result, the Cedar court found that "[a]bsent a specific amendment of the charge to include a constructive discharge claim, or extensive factual allegations concerning intolerable working conditions which clearly point to the unnamed legal conclusion that a constructive discharge *has* occurred, or evidence as to the actual scope of the EEOC investigation or the subject of conciliation attempts, . . . a claim of constructive discharge is outside the scope of an EEOC charge concerning discriminatory demotion."  Id., at *4 (emphasis added).

There are no extensive factual allegations in the EEOC charge.  Thus, given the standard, the timing of the charge, and lack of extensive factual allegations that clearly point to the unnamed legal conclusion that a constructive discharge *had* occurred at the time the charge was filed, the Court lacks jurisdiction to determine this claim because of a lack of jurisdiction.  See Farmer v. ARA Servs., Inc., 660 F.2d 1096, 1105 (6th Cir. 1981), Cedar, 1989 WL 20615, *4.

### C.    Plaintiff's Retaliation Claim

In order to establish a *prima facie* case of Title VII retaliation, a plaintiff must prove that: (1) he engaged in activity protected by Title VII; (2) the exercise of a protected right was known to the defendant; (3) the defendant subsequently took an adverse employment action against the

20

plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.  Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'  Rochon, 438 F.3d, at 1219 (quoting Washington, 420 F.3d, at 662)."  Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (U.S. 2006).

After a plaintiff establishes a *prima facie* case, the defendant then has the burden of production of evidence to "articulate some legitimate, nondiscriminatory reason" for its actions. Id., at 793 (quoting McDonnell Douglas, 411 U.S. at 802).  Once the defendant establishes a legitimate, nondiscriminatory reason for its actions, the plaintiff, who bears the burden of persuasion throughout the entire process, must then demonstrate "that the proffered reason was not the true reason for the employment decision."  Burdine, 450 U.S. at 256.

Fowler first claims he was retaliated against for complaining of racial harassment to Sanders, which led to Sanders involving HelpNet.  Fowler has no evidence that anyone knew that he complained to Sanders about racial discrimination.  Moreover, there is no evidence that anyone attributed HelpNet's involvement to his complaints to Sanders.  Further, Sanders admits that he initiated discussions with his supervisor in order to bring HelpNet in for a variety of issues that were not limited to race discrimination.  Def.'s Reply Br., Ex. 25.  Thus, there is no evidence Defendant retaliated against him for his complaints about racial animus to Sanders.

21

On the other hand, giving all reasonable inferences to Fowler, it would have been well-known among management that he sent a letter to the CEO accusing them of discrimination. Moreover, an EEOC representative was sent to investigate *his* charges. Thus, there may be enough to establish a prima facie case of retaliation based on his letter to English because allegedly retaliatory disciplines occurred after the EEOC investigation. However, there are problems with causation and timing for the allegedly retaliatory act of placing him of disability retirement after sending the letter to English and then filing charges with the EEOC. He did not return to work after filing the charges, and it was almost a year later, when he became eligible for a disability retirement, that he was placed on a medical retirement. Thus, the causal link of retaliation is fatally weakened by Defendant's decision to "retaliate" against him by waiting until he was eligible for retirement benefits almost a year after accusing his manager of discrimination.

However, even if the Court were to find that there was enough evidence to establish a prima facie case of retaliation, just as with his discrimination claim, he cannot rebut Defendant's legitimate, non-discriminatory reasons it has proffered for its actions. Therefore, this component of his claim is DISMISSED.

V.     **CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED.**

**IT IS SO ORDERED.**

S/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: <u>April 23, 2007</u>

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and electronic filing.

<u>s/Bernadette M. Thebolt  </u>
DEPUTY CLERK